# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT GREENEVILLE

DAVID G. JENKINS,          )
                                )

         Petitioner,         )
                                )

v.                           )         No.: 2:22-CV-81-DCLC-CRW
                                )

BRIAN ELLER,           )
                                )

         Respondent.      )

## <u>MEMORANDUM OPINION</u>

Petitioner David G. Jenkins, an inmate serving a life sentence in the custody of the Tennessee Department of Correction ("TDOC"), filed a pro se federal habeas action pursuant to 28 U.S.C. § 2254 challenging the legality of his confinement under a Franklin County, Tennessee, judgment of conviction for first-degree premeditated murder [Doc. 12]. Having considered the submissions of the parties, the State-court record, and the law applicable to Petitioner's claims, the Court finds an evidentiary hearing is not warranted[1], and that the petition should be denied.

## I.    SUMMARY OF EVIDENCE & PROCEDURAL HISTORY

On post-conviction appeal, the Tennessee Court of Criminal Appeals' ("TCCA") summarized the relevant facts adduced during Petitioner's trial as follows:

> [T]the evidence presented at trial established that the victim, Corey Matthews, was a member of the Aryan Nation and was serving as a confidential informant for law enforcement. After other members of the Aryan Nation learned of the victim's actions, the Petitioner and his co-defendants, Todd Dalton, John Corey Lanier, and Coty Holmes, drove the victim to a remote location where they beat the victim. *David G. Jenkins*, 2017 WL 1425610, at *1. Co-defendant Lanier used a knife to cut an "X" over the victim's Aryan Nation tattoo on his abdomen. The Petitioner then struck the victim on the head and face multiple times with a ball-pe[e]n hammer, resulting in the victim's death.

---

[1] *See* Rules Governing § 2254 Cases, Rule 8(a); *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

Co-defendants Holmes and Lanier testified at trial concerning the events leading up to the victim's death. On the day of the offense, at approximately 10:00 a.m., co-defendant Dalton called and asked co-defendant Holmes to come to his shop. Co-defendant Holmes then learned that the victim was to be kicked out of the Aryan Nation because the victim had been serving as an informant for law enforcement. Co-defendant Holmes understood that the victim would receive a "beat-out" and that the victim's "patch" or tattoo would be "covered." Co-defendant Holmes explained that the victim's tattoo would either be cut or covered with another tattoo. Co-defendant Holmes said the Petitioner was present during the conversation about what was to happen to the victim.

Before they left co-defendant Dalton's shop, co-defendant Holmes observed the Petitioner retrieve a ball-pe[e]n hammer from the back of his truck. The men then went to pick up co-defendant Lanier and eventually went to Tractor Supply in Winchester, Tennessee, to meet the victim. The victim got into the backseat of co-defendant Dalton's truck with codefendants Lanier and Holmes. After driving to another friend's home, the men returned to the Tractor Supply store where the victim's car was parked. The men eventually drove to the victim's home, where all five of the men got into co-defendant Dalton's truck. Co-defendant Holmes turned off his cellular phone, and co-defendant Dalton placed it in the glove compartment of his truck. Co-defendant Holmes believed everyone turned off their cellular phones and put them away.

Co-defendant Dalton drove to a cemetery located approximately ten to fifteen minutes from the victim's home. Upon arriving, the victim was eventually pushed into co-defendant Holmes and they "tangled up, threw a couple of punches, [and] went to the ground." Co-defendant Holmes punched the victim "a couple of times" and while the victim was lying on the ground, the other four men hit and kicked the victim "a couple of times." The Petitioner then retrieved a ball-pe[e]n hammer and began hitting the victim in the head with it. The co-defendants yelled at the Petitioner to stop; however, the Petitioner hit the victim five or six times, stopped, and then resumed hitting the victim five or six more times. Once the Petitioner and the other co-defendants got back into the truck, the Petitioner acted excited and told co-defendant Holmes and Lanier that they "had earned [their] bones."

Co-defendant Lanier confirmed that the victim was a member of the Aryan Nation and that the Petitioner had told him that the Petitioner was associated with the Aryan Brotherhood. Co-defendant Lanier said that upon arriving at the cemetery co-defendant Dalton told the victim, "You [have] been talking to the police. You know what that means." The Petitioner and co-defendant Holmes then went after the victim. Co-defendant Lanier confessed to tackling and hitting the victim twice. After the men cut an "X" over the victim's tattoo, they kicked the victim in the head and stomped him. Co-defendant Lanier testified that the men were about to leave the victim; however, the Petitioner hit the victim in the head with a ball-pe[e]n hammer three to four times. Co-defendant Lanier yelled at the Petitioner to stop,

and the men got in the truck and left. Co-defendant Lanier said that the victim was conscious when he was cut and semi-conscious and making sounds before the Petitioner hit him with the hammer. *David G. Jenkins*, 2017 WL 1425610, at *5–6.

The men returned to Manchester, Tennessee, where the Petitioner purchased beer at Tops, a convenience store. The Petitioner had blood on his arms and stated that "the lady in the store looked at him like he was crazy because he had blood on his arms." Co-defendant Holmes stated that co-defendant Dalton owned a trailer on co-defendant Dalton's property where a man named "Shorty" lived. Co-defendants Holmes and Dalton went to the trailer, and co-defendant Dalton told "Shorty" what had occurred. *David G. Jenkins*, 2017 WL 1425610, at *2–4.

Co-defendant Lanier confirmed he was a "regular member" of the Aryan Nation and was not an "enforcer." He said the Petitioner was a member of the Aryan Brotherhood and not the Aryan Nation. A few days prior to the victim's death, co-defendant Lanier attended a meeting at the home of "Shorty" and Tabatha Roulette Jones. Co-defendant Lanier attended one formal meeting of the Aryan Nation during which rankings were discussed. The victim said he was an "enforcer" with the gang, which co-defendant Lanier believed meant that the victim ensured that people followed the rules. Co-defendant Lanier said a member who violated the rules of the Aryan Nation could have his tattoo removed. *David G. Jenkins*, 2017 WL 1425610, at *6. Co-defendant Lanier stated that the Petitioner had blood and brain matter on him when he purchased beer at the convenience store following the victim's death. Co-defendant Lanier testified that when he was a member of the Aryan Nation, he believed that "blood out," during which a member was removed from the gang, meant that the member was beaten and not that the member was killed. Co-defendant Lanier did not recall the Petitioner saying anything about the blood and brain matter on him upon returning from purchasing beer following the victim's death. *State v. David G. Jenkins*, 2017 WL 1425610, at *6.

On March 24, 2013, in response to a missing person report filed by the victim's wife, Officer Mike Holmes of the Cowan Police Department began driving around Jackson Cemetery, a secluded area near the victim's home where people would go to think or fight. Officer Holmes found the victim's body in a cut cornfield approximately thirty yards from the gravel road that separated the cemetery and the cornfield. *David G. Jenkins*, 2017 WL 1425610, at *8. Investigator Brian Brewer with the Franklin County Sherriff's Office eventually developed the Petitioner, and co-defendants Dalton, Lanier, and Holmes as those who were with the victim on Saturday, March 23, 2013, prior to his death. *Id.* Officers also obtained videotapes of the Petitioner along with the victim and the co-defendants recorded by several convenience stores on March 23, prior to the victim's death. Investigator Brewer said that while he received information that the Defendant and the co-defendants stopped at another convenience store to purchase beer after killing the victim, he was unable to place any of the men at a particular convenience store during that time period. *Id.* at 8. The Petitioner was eventually apprehended in September 2013, in Hobbs, New Mexico. *David G. Jenkins*, 2017 WL 1425610, at *11.

*Jenkins v. State*, No. M2019-01238-CCA-R3-PC, 2021 WL 979270, at *1–2 (Tenn. Crim. App. Mar. 16, 2021), *perm. app. denied* (Tenn. July 12, 2021) ("*Jenkins II*").  Petitioner was initially charged with both first-degree premeditated murder and felony murder in perpetration of especially aggravated kidnapping [*See* Doc. 10-1 p. 10–11].  However, the trial court granted the defense's motion for judgment of acquittal on the felony murder charge [Doc. 10-12 p. 89–93].  Following the conclusion of proof, the jury found Petitioner guilty of first-degree murder [Doc. 10-14 p. 141].  Petitioner was sentenced to life in the custody of the Tennessee Department of Correction, to be served consecutive a Coffee County sentence for a prior offense [Doc. 10-2 p. 15; *see also* Doc. 10-14 p. 146–166].

Petitioner appealed his conviction to the TCCA, which affirmed the judgment of the trial court.  *State v. Jenkins*, No. M2016-00270-CCA-R3-CD, 2017 WL 1425610, at *1 (Tenn. Crim. App. Apr. 21, 2017), *perm. app. denied* (Tenn. Sept. 20, 2017) ("*Jenkins I*").  The Tennessee Supreme Court denied Petitioner's application for discretionary review [Doc. 10-23].

Petitioner filed a timely pro se petition for post-conviction relief [Doc. 10-24 p. 10–26].  The trial court appointed a series of three different post-conviction attorneys to represent Petitioner [*Id.* at 32, 35, 41].  The third post-conviction counsel, Timothy Gudmudson, filed an amended petition on Petitioner's behalf [*Id.* at 103–35].  Petitioner subsequently filed a motion to proceed pro se in his post-conviction proceedings [*Id.* at 52–53].  That motion was granted, and Petitioner proceeded pro se at his post-conviction evidentiary hearing, with Mr. Gudmudson remaining in the case as "elbow counsel" [Doc. 10-25 p. 30].

The TCCA summarized the proof presented at the post-conviction evidentiary hearing as follows:

The Petitioner called several witnesses who previously testified at trial including Dr. David Zimmerman, Special Agent Maureen Bottrell, Special Agent Charly Castelbuono, Special Agent Michael Frizzell, Special Agent Nicholas Christian, and Investigator Bradley Weaver. He also called the first attorney appointed to represent him, both assistant district attorneys who prosecuted his case, and lead counsel. He did not call co-counsel to testify. Additionally, the guilty plea transcripts of co-defendants Holmes and Lanier were entered into evidence as exhibits to the hearing.

As relevant here, Dr. Zimmerman conducted the autopsy of the victim and previously testified at trial that the victim died on either Saturday, March 23 or Sunday, March 24, based upon his examination. *David G. Jenkins*, 2017 WL 1425610, at *10. Dr. Zimmerman noted fourteen separate lacerations to the victim's head and face as a result of blunt force trauma. The lacerations included an "L" shaped laceration on the right side of the victim's scalp. Dr. Zimmerman said ten of the blows were likely significant enough to have caused the victim's death. He said a hammer could have caused the fourteen blows to the victim's head and face. Dr. Zimmerman agreed that two lacerations were "L" shaped and were not consistent with the "round part" of a hammer. He stated that if an "L" shaped piece of metal were used, he would expect abrasions on both sides of the laceration. *Id.* Dr. Zimmerman also testified that a hammer with a flat face usually would not have caused the "L" shaped injuries. He stated that the edge of a flat object could have caused the "L" shaped lacerations. He also stated that had the victim been hit with any straight portion of a ball-pe[e]n hammer, it could have caused the "L" shaped lacerations. *Id.* at *11.

At the post-conviction hearing, the Petitioner showed Dr. Zimmerman two unidentified photographs that were presumably presented as exhibits at trial. Dr. Zimmerman said there were "no distinguishing marks about the wounds in these pictures." He reiterated his trial testimony that the wounds "could have been from a glancing blow from that hammer, but it could also have been from something totally different." Asked if he could say "with full confidence, a ball-pe[e]n hammer inflicted that wound," Dr. Zimmerman replied, "No. I can say that some hard object inflicted that wound." He agreed that it was possible that more than one weapon was used in the commission of the victim's death. Dr. Zimmerman also agreed that he was unable to determine the exact time of the victim's death. Dr. Zimmerman was questioned about the medical history leading up to the death of Christopher "Shorty" Bryan[], the evaluation of which was conducted by an associate. The medical report, admitted into evidence without objection, showed that Christopher "Shorty" Bryan[] died of a "suspected overdose." Dr. Zimmerman testified that an autopsy is not conducted on an individual "if there is a significant potential natural cause of death" or an "extended period of time since injury" and the person[']s death.

Agent Maureen Bottrell previously testified at trial as a geologist forensic examiner with the Federal Bureau of Investigation (FBI). Her report, admitted as an exhibit

at trial, compared soil samples from the field where the victim's body was found to the debris taken from the victim's shoes, debris from co-defendant Dalton's truck, and debris taken from the Petitioner's boots, none of which were determined to match. She explained that the difference between the known soil sample and other items may have been impacted by the depth of the soil or changes within the soil location that can occur "very abruptly." She said these changes may be affected by distance, weather, and time frame. Defense counsel did not cross-examine Bottrell at trial. At the post-conviction hearing, Agent Bottrell reiterated her conclusions that the soil did not match. With respect to the Petitioner's boots, she said the soil was a different color, which concluded her analysis. She also compared the soil from the victim's shoes to the soil from the Petitioner's boots and determined it did not match.

The first attorney appointed to represent the Petitioner in this case, who did not represent the Petitioner at trial, testified that at the time of his representation he did not recall whether a second statement by co-defendant Cory Lanier existed. He also testified that the cell phone records provided to him by the State were difficult to explain to the Petitioner, and they did not provide an exact address for the location of the cell phone. He stated that he provided the Petitioner with every statement that was provided to him by the District Attorney's office.

Special Agent Charly Castelbuono, a forensic biologist with the Tennessee Bureau of Investigation (TBI), previously testified at trial that the victim's blood was on the front passenger's side door around the area of the speaker of co-defendant Dalton's truck, that the truck smelled of bleach or some kind of cleaning agent, and that there was discoloration on the floorboard. *David G. Jenkins*, 2017 WL 1425610, at *9. A beer can found near the victim's body had a saliva mixture of two DNA profiles around the mouth area with the victim as the major contributor. Her testimony at the post-conviction hearing was consistent with her trial testimony. Agent Castelbuono also testified that she did not receive any other known DNA standards except those belonging to the Petitioner and the victim. She also confirmed that she previously tested various items from the Petitioner's home, none of which contained DNA other than his own.

Assistant District Attorney (ADA) Steve Blount, a veteran prosecutor with nearly thirty-five years of experience, was the lead prosecutor assigned to try the Petitioner's case. ADA Blount testified that he had "butted heads" with both lead counsel and co-counsel during trial. He agreed that co-counsel had used both podiums and that co-counsel may have left his notes on the State's podium. ADA Blount said that co-counsel also moved his chair closer to the State's table to better hear witnesses. ADA Blount further explained that co-counsel had revealed where Tabitha Roulette Jones, a trial witness for the State, lived during questioning, upon which ADA Blount asked to approach the bench. During the bench conference, ADA Blount said the comment by co-counsel was inappropriate and unethical. ADA Blount said co-counsel then became upset with him because he had questioned co-counsel's ethics, and the court told both parties to "calm down."

Asked if comments such as "taking [an attorney] outside" or "I don't care if you disbar me and put me in jail" were improper, ADA Blount explained:

> That is not unusual behavior in litigation, especially when one attorney accuses the other attorney of being or saying something that is interpreted as being unethical. I've done this almost 35 years, and that is not the first time that I've experienced two lawyers in the heat of a battle. . . . of a multiple day trial, get upset with each other, say things about each other, so, no, that's not unprofessional conduct.

ADA Blount was asked additional questions concerning witness Tabitha Roulette Jones. He stated that prior to trial, the State took the deposition of Jones and intended for her to testify at trial. When Jones testified, ADA Courtney Lynch asked her to explain why her boyfriend Christopher "Shorty" Bryan[], another intended witness, was not there, expecting Jones to say Bryan[] was deceased. However, Jones said Bryan[] had been killed because of his cooperation with authorities, which ADA Blount characterized as non-responsive. ADA Blount said that Jones's testimony did not implicate the Petitioner in the death of Bryan[]. ADA Blount denied any knowledge of the circumstances of his death and noted that ADA Lynch did not pursue that line of questioning upon receiving Jones's unexpected response. He was unaware that Jones received a disability check from the State, and he stated that there was nothing in his interaction with Jones that demonstrated she may have been incompetent or not qualified to testify as a witness at trial.

ADA Blount also stated that while he had no independent recollection of the exact name of the store, information in their investigation led him to believe that the Petitioner and his co-defendants went to a store after the homicide. ADA Blount hoped investigators could find videos to substantiate the statements; however, the investigators were unable to do so. There was a lengthy discussion concerning the testimony of Lisa Lotz, a witness at trial who described the Petitioner's tattoos. ADA Blount explained there was no photograph of the Petitioner's tattoos admitted into evidence until after her testimony. Apparently, at the insistence of the Petitioner, photographs of his tattoos were later taken and used by both parties in closing argument. The State argued in closing that the photo matched Lotz's description, but the defense argued it did not.

Lead counsel, a veteran defense attorney with over 32 years of experience, testified regarding his involvement in this case. Lead counsel confirmed that he had received the first statement of co-defendant Cory Lanier "early on" and received a second statement "late in the game" or "two or three days" prior to trial. Lead counsel said they suspected the second statement existed. Lead counsel said he listened to the second statement prior to trial, took notes, and brought his notes with him to trial. He said he could impeach the witness with his notes or the transcript of the statement. He said the court was also equipped with the ability to pull up the recording for impeachment purposes had that been necessary. Lead counsel confirmed that there was information that the Petitioner and the co-defendants had

gone to a store following the murder; however, lead counsel said the investigators were unable to find the store. Lead counsel agreed that he interviewed the Petitioner's girlfriend, Heather Albright, prior to trial. His notes about the interview were admitted as an exhibit to the hearing. Lead counsel further agreed that he did not re-interview Albright after interviewing Josh Russell. Russell, an inmate at the Bedford County Jail, testified at trial that the Petitioner told him about the murder and that the police did not find any evidence at his home because he went to his girlfriend's home after the homicide. He said that Russell "sort [of] got thrown on us at the eleventh hour." Lead counsel said he did not call Albright to testify at trial because she was not to be found. He investigated the theory that the victim was killed somewhere other than the offense location; however, they were unable to substantiate that theory.

The Petitioner's W-2's from his employment in New Mexico were admitted into evidence, and the Petitioner suggested the records disputed the jury instruction on flight. Lead counsel admitted the Petitioner's employer was cooperative. Lead counsel said that he remembered investigating the Petitioner's cell phone records of communications between the Petitioner and Albright; however, he did not find any for the relevant time-period, and Albright could not remember any communications. Lead counsel confirmed that they obtained the Petitioner's cell phone records and that there was a difference between the cell phone records received from the first attorney and lead counsel. However, lead counsel noted upon prompting by the court that neither record showed any cell activity during the "12, 15-hour period, that [the Petitioner was] looking at." Lead counsel also said that he had a cell phone expert examine the Petitioner's cell phone records and had "laboriously" gone through the text messages, but he could not find anything that was inconsistent with the testimony at trial. As for the testimony of Tabitha Roulette, lead counsel said that they investigated whether it was possible for her to have overheard the discussion outside her trailer between the co-defendant's and her late boyfriend. Lead counsel recalled it was possible or that there was not enough evidence to the contrary. Lead counsel said it was more important to elicit the testimony that Roulette saw blood on co-defendant Holmes, not the Petitioner, that night. Lead counsel said the issue "passed *Crawford*;" but he did not "catch" any *Bruton* issue. Asked whether lead counsel could have forced co-defendant Dalton to testify about his policy of leaving someone in his house with his wife while co-defendant Dalton was not there, trial counsel disagreed that that would have been admissible. The Petitioner argued with lead counsel that although he moved for the admission of co-defendant Dalton's testimony and was denied by the trial court, lead counsel never argued that the testimony was admissible as "res gestae."

Lead counsel recalled that co-counsel may have forgotten things during voir dire and may have misstated witness names during trial. Lead counsel explained however as follows:

> Oh, I disagree with that. [Co-counsel] is a very, very smart man. He does not – detail has never been his strong point. Thinking things through and strategizing is, and he's the best I've ever seen at it to this day.

He continued to explain that "jurors love [co-counsel]." He acknowledged that co-counsel told the jury that he had had brain surgery and a stent put in, which had been within the past year. Lead counsel denied co-counsel was "confused" so much so that witness testimony was not admitted during trial. Lead counsel said that he had co-defendant Cory Lanier's second statement and was prepared to use it at trial. Lead counsel also hired a private investigator with his personal funds to facilitate the interview of Lisa Lotz in New Mexico. Lead counsel confirmed that photographs of the Petitioner's tattoos were taken at trial. However, he said that he would not have shown the photographs to Lotz, even if given the opportunity. He said there was "[t]oo much risk she would have pointed directly to it and it would have backfired." The Petitioner did not call co-counsel to testify although he was present at the hearing.

The Petitioner called TBI Special Agent Michael Frizzell, who previously testified at trial, in relevant part, that he was employed with the TBI's technical services unit and analyzed the cellular phone records of the Petitioner, his co-defendants, and the victim for March 23, 2013. Special Agent Frizzell testified that according to the Petitioner's cellular phone records, the network did not register after 10:10 a.m. The agent said the Petitioner's cellular phone was either turned off or in a "dead spot." *David G. Jenkins*, 2017 WL 1425610, at *9–10. Special Agent Frizzell agreed that someone attempted to contact the Petitioner, but his cell phone did not register. Special Agent Frizzell said that he could not determine based on the records he was provided whether this attempt was voice or text communication. Special Agent Frizzell clarified at trial that the cell phone records he was requested to analyze were for voice communication only. Special Agent Frizzell did not have real time data (RTD) or range to tower (RTT) data, which provides text information, for the Petitioner's cell phone records. Accordingly, Special Agent Frizzell testified that the Petitioner's cellular phone could have been used for texting on the day of the offense at trial.

At the post-conviction hearing, Special Agent Frizzell testified consistently with his trial testimony. He also reviewed the cell phone records the Petitioner obtained from his first attorney and determined that it was a Cellebrite cellular phone extraction report. Upon review of these records, Special Agent Frizzell confirmed there were two text messages, at 4:00 p.m. and 5:46 p.m. (central standard time), on the Petitioner's cellular phone on the day of the offense. He did not find any text message activity between 5:46 p.m. and 11:00 p.m. (central standard time). Special Agent Frizzell said that at the time of the offense, Verizon did not include tower usage for texting in their data so it would have been impossible to track the geographical location of a phone based on text communication.

9

The Petitioner called TBI Special Agent Nicholas Christian, who explained that he conducted the extraction on the cellular phones involved in the instant case. He provided his extraction report to TBI Special Agent Chip Andy. He further testified that the data on his extraction report is not the same as the information collected by the cell phone provider. TBI Special Agent Leo "Chip" Andy, III, testified that he responded to the crime scene, photographed the Petitioner's tattoos, and participated in obtaining the warrants to retrieve the cell phone records in this case. Special Agent Andy also testified generally regarding polygraph examinations and, over the prosecutor's objection, was permitted to testify that co-defendant Lanier had engaged in "deceptive" behavior during his polygraph examination. On cross-examination, Special Agent Andy said he collected the soil samples from the crime scene three months after the offense.

Investigator Bradley Weaver testified that he was familiar with the victim, had received information from the victim, and that none of the cases the victim had provided information on involved the Petitioner. Investigator Weaver had no information on the Petitioner prior to the instant offense. He said the victim provided information on drug cases but died before they were adjudicated.

Courtney Lynch, the assistant district attorney who served as co-counsel to ADA Blount, was also called to testify. ADA Blount was unaware that co-defendant Lanier had failed a polygraph examination and, when asked about her comment in opening statement of trial that the co-defendants were given "a deal" in exchange for their "truthful" testimony, she explained:

> If I had it to do over again[,] I may not use that word, but I was trying to call attention to the fact that we weren't hiding. We had agreed – made agreement with them, we had disclosed that to the defense, just get that out there in the open in the beginning, that we did talk to them, they are going to testify for the State against the [Petitioner] was just kind of off the cuff . . .

She continued to state that she would never "put a witness on that we didn't want to be truthful." She said Tabitha Roulette Jones's testimony concerning the circumstances of Christopher "Shorty" Bryan[]'s death was truthful to ADA Lynch's knowledge.

*Jenkins II*, 2021 WL 979270, at *3–7. In a written Memorandum Opinion and Order, the post-conviction trial court denied relief [Doc. 10-25 p. 52–56]. Proceeding pro se, Petitioner appealed the denial of post-conviction relief to the TCCA [*see* Doc. 10-32], which affirmed the denial of post-conviction relief. *Jenkins II*, 2021 WL 979270, at *1. Petitioner's application for discretionary review was denied by the Tennessee Supreme Court [Doc. 10-38].

Thereafter, Petitioner filed a timely petition for writ of habeas corpus [Doc. 1]. In response to the Court's Order for him to do so, Respondent filed the State-court record [Doc. 10] and an answer to the petition [Doc. 11]. Later, over Respondent's objection [Docs. 18], Petitioner was permitted to file an amended petition [Doc. 12, *see also* Doc. 24] raising the following grounds[2] for relief, as paraphrased by the Court:

I.     Ineffective Assistance of Counsel
     A.    Failure to Effectively Cross-Examine Special Agent Frizzell
     B.    Failure to Effectively Cross-Examine Agent Maureen Bottrell
     C.    Co-Counsel's Mental Capacity
     D.    Failure to Effectively Cross-Examine Cory Lanier
     E.    Failure to Enter Exculpatory Text Messages
     F.    Failure to Effectively Cross-Examine Dr. Zimmerman
     G.    Co-Counsel's Crude, Unprofessional Conduct
     H.    Failure to Make Timely Objections

II.    Prosecutorial Misconduct
     A.    Subornation of Perjury
     B.    Improper Argument
     C.    Failure to Disclose
     D.    Disregard for Due Process

III.   Rule 404(b) Violations
     A.    References to Petitioner's Membership in the Aryan Brotherhood
     B.    References to Other Murders
     C.    References to Murder and Cannibalism in New Jersey
     D.    References to Drug Use
     E.    Implying Petitioner was Responsible for Shorty Bryan's Murder

IV.   *Massiah*/*Giglio* Violations

---

[2] Under "Issues Presented for Review" in his amended petition, Petitioner states he is raising the claim "Actual[] Innocen[ce]" [Doc. 12 p. 14]. But, as Petitioner recognizes in his reply to Respondent's answer, "'actual innocence' is not a freestanding constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits" [Doc. 32 p. 10 (citing *Herrera v. Collins*, 506 U.S. 390, 400 (1993)]. Accordingly, the Court does not consider Petitioner's assertion of actual innocence as an independent claim but will address the doctrine in its discussion of any of Petitioner's otherwise barred claims.

11

[Doc. 12]. Respondent answered the amended petition [Doc. 31], and Petitioner filed a reply thereto [Doc. 32]. This matter is ripe for review.

## II.    LEGAL STANDARD

The Court's review of the instant petition is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which prevents the grant of federal habeas relief on any claim adjudicated on the merits in state court unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established United States Supreme Court precedent; or (2) resulted in a decision based on an unreasonable determination of facts in light of the evidence presented. *See* 28 U.S.C. § 2254(d)(1) & (2); *Schriro*, 550 U.S. at 473. When evaluating the evidence presented in state court, a federal habeas court presumes the correctness of the state court's factual findings unless the petitioner rebuts the presumption by clear and convincing evidence. *See* 28 U.S.C. § 2254(e)(1).

Federal habeas relief may be granted under the "contrary to" clause where the state court (1) arrives at a conclusion opposite that reached by the Supreme Court on a question of law; or (2) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). Under the "unreasonable application" clause, a federal court may grant relief where the state court applies the correct legal principle to the facts in an unreasonable manner. *Williams*, 529 U.S. at 407–08; *Brown v. Payton*, 544 U.S. 133, 141 (2005). But even an incorrect state court decision is not necessarily unreasonable. *See Schriro*, 550 U.S. at 473 ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Williams*, 529 U.S. at 410–11. Rather, this Court may grant relief for a claim decided on its merits in state court only where the petitioner demonstrates that the state

12

court ruling "was so lacking in justification that there was an error understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

Federal habeas review is also limited by the doctrine of procedural default. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999) (holding prisoner's procedural default forfeits his federal habeas claim). A procedural default exists in two circumstances: (1) where the petitioner fails to exhaust all of his available state remedies, and the state court to which he would be required to litigate the matter would now find the claims procedurally barred, and (2) where a state court clearly and expressly bases its dismissal of a claim on a state procedural rule, and that rule provides an independent and adequate basis for the dismissal. *See, e.g., Coleman v. Thompson*, 501 U.S. 722, 729, 731–32, 735 n.1 (1991).

Exhaustion requires a petitioner to have "fairly presented" each federal claim to all levels of the state appellate system to ensure that states have a "full and fair opportunity to rule on the petitioner's claims." *Manning v. Alexander*, 912 F.2d 878, 881 (6th Cir. 1990) (citing *Justices v. Boston Mun. Ct. v. Lydon*, 466 U.S. 294, 302–03 (1984)). This requirement is satisfied when the petitioner fairly presents her federal claim through the State's appellate court system. *Duncan v. Henry*, 513 U.S. 364, 365-66 (1995); *see also* 28 U.S.C. § 2254(c) ("An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if [s]he has the right under the law of the State to raise, by any available procedure, the question presented."). Fair presentation means that "the substance of a federal habeas corpus claim must first be presented to the state courts." *Picard v. Connor*, 404 U.S. 270, 278 (1971). "It is not enough that all the facts necessary to support the federal claim were before the state courts, or that a somewhat similar state-law claim was made." *Anderson v. Harless*, 459 U.S. 4, 6 (1982) (internal citations omitted). Instead, the doctrine of exhaustion requires a petitioner to present "the

13

same claim under the same theory" to the state courts as he seeks to present in federal court. *Pillette v. Foltz*, 824 F.2d 494, 497 (6th Cir. 1987); *see also Wagner v. Smith*, 581 F.3d 410, 418 (6th Cir. 2009) (finding constitutional claim must be presented in federal court under the same theory as presented in state appellate process). In Tennessee, presentation of a federal claim to the TCCA satisfies the exhaustion requirement. *Adams v. Holland*, 330 F.3d 398 (6th Cir. 2003); *see also* Tenn. S. Ct. R. 39 (establishing presentation of claim to TCCA is sufficient to exhaust State remedies).

But if a prisoner never presented a claim to the TCCA and a state procedural rule now bars presentation of the claim, because, for example, it is barred by Tennessee's one-year statute of limitation on post-conviction actions or its prohibition against second petitions, that claim is technically exhausted but procedurally defaulted. *Gray v. Netherland*, 518 U.S. 152, 161–62 (1996); *Coleman*, 501 U.S. at 731–32, 750; *Jones v. Bagley*, 696 F.3d 475, 483 (6th Cir. 2012) ("When a petitioner has failed to present a legal issue to the state courts and no state remedy remains available, the issue is procedurally defaulted"); *see also* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period) and Tenn. Code Ann. § 40-30-102(c) ("one petition" rule).

The second circumstance giving rise to a procedural default occurs where "a state procedural rule . . . prevent[ed] the state courts from reaching the merits of the petitioner's claim[.]" *Seymour v. Walker*, 224 F.3d 542, 550 (6th Cir. 2000) (citing *Wainwright v. Sykes*, 433 U.S. 72, 80, 84-87 (1997)). A federal court is generally prevented from considering a federal-law claim "arising from the judgment of a state court if the state judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the state court's decision." *Munson v. Kapture*, 384 F.3d 310, 313–14 (6th Cir. 2004) (internal quotation marks and alterations omitted); *see also Guilmette v. Howes*, 624 F.3d 286, 290 (6th Cir. 2010) (citing *Tolliver v. Sheets*, 594 F.3d 900, 928 n.11 (6th Cir. 2010)). When determining whether a claim

14

has been procedurally defaulted based on an adequate and independent state procedural rule, the court applies the following test:

> (1) the court must determine that there is a state procedural rule with which the petitioner failed to comply; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) the state procedural rule must have been an adequate and independent state procedural ground upon which the state could rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petition must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error.

*Monzo v. Edwards*, 281 F.3d 568, 576 (6th Cir. 2002).

In some circumstances, a procedural default may be circumvented to allow federal habeas review of a claim. But that is appropriate only where the prisoner can show cause for the default and actual resulting prejudice, or that a failure to address the merits of the claim would result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 749–50; *see also Wainwright v. Sykes*, 433 U.S. 72, 87, 90–91 (1977). The exception for a fundamental miscarriage of justice is reserved for the extraordinary case in which the alleged constitutional error probably resulted in the conviction of one who is "actually innocent of the underlying offense[.]" *Dretke v. Haley*, 541 U.S. 386, 388 (2004); *Murray v. Carrier*, 477 U.S. 478, 496 (1986). Actual innocence in this context "means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). A viable claim of actual innocence "requires [the] petitioner to support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Schlup v. Delo*, 513 U.S. 298, 324 (1995). To invoke the exception, a petitioner "must show that it is more likely than not that no reasonable juror would have convicted him in light of the new evidence." *Id.* at 327.

With regard to the "cause and prejudice" exception for procedural default, the "prejudice" sufficient to overcome a default must be actual, with the petitioner bearing "the burden of showing, not merely that the errors [in the proceeding] created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire [proceeding] with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). And "cause" for a default is established where a petitioner can show some objective external factor impeded defense counsel's ability to comply with the state's procedural rules. *See Coleman*, 501 U.S. at 753.

## III.     ANALYSIS

### A.     Untimely Claims

#### 1.     Procedural Determination

Respondent maintains that four ineffective-assistance-of-counsel claims raised in Petitioner's amended petition are untimely, as they were not raised in his initial federal habeas petition[3] [Doc. 31 p. 8–11]. A one-year statute of limitations applies to habeas petitions filed pursuant to 28 U.S.C. § 2254. 28 U.S.C. § 2244(d)(1); *Isham v. Randle*, 226 F.3d 691, 693 (6th Cir. 2000). The statute's limitation period provides:

> (d)(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of –
> (A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
> (B) the date on which the impediment to filing an application created by State action in violation of the Constitution or the laws of the United States is removed, if the applicant was prevented from filing by such State action;
> (C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

---

[3] These are Petitioner's claims that he received ineffective assistance based on (1) co-counsel's alleged diminished capacity; (2) failure to introduce exculpatory text messages; (3) cross-examination of Dr. Zimmerman; and (4) co-counsel's "crude" and "unprofessional" conduct [Doc. 31 p. 8–11].

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1). Here, § 2244(d)(1)(A) applies to the timeliness of Petitioner's amendment because it is "the latest" and most "relevant" of the four triggering events. *Hodge v. Nixon*, No. 3:14-cv-2322, 2015 WL 2193811, at *1 (M.D. Tenn. May 8, 2015).

Petitioner's conviction became final on December 20, 2017, after the expiration of the time within which to petition the United States Supreme Court for certiorari [Doc. 10-23, denying review on Sept. 20, 2017]. *See* Sup. Ct. R. 13(1); *Lawrence v. Florida*, 549 U.S. 327, 333 (2007). The statute of limitations did not begin running at that time, however, as Petitioner had already filed his pro se post-conviction petition [Doc. 10-24]. Thus, the limitations period was tolled under § 2244(d)(2) until Petitioner's post-conviction proceedings were completed on July 12, 2021, with the Tennessee Supreme Court's denial of his application for discretionary review [Doc. 10-38]. 28 U.S.C. § 2244(d)(2) (providing the limitations period is tolled while a "properly filed application for State post-conviction or other collateral review" is pending). The federal limitations period began running the following day, July 13, 2021, and it expired one year later on July 13, 2022. Petitioner did not file his amended petition until January 6, 2023. Therefore, the claims in his amended petition are time-barred unless they relate back to the initial, timely-filed petition.

When an initial petition is timely filed, but the petitioner "later presents new claims in an amended petition filed after the deadline passes, the new claims relate back to the date of the original petition if the new claims share a common core of operative facts with the original petition." *Cowan v. Stovall*, 645 F.3d 815, 818 (6th Cir. 2011) (citing *Mayle v. Felix*, 545 U.S. 644, 664 (2005)). In permitting Plaintiff to file an amended petition, the Court found that the claims in the proposed amended petition related to those presented in Petitioner's initial petition

to prevent the petition from being untimely [Doc. 24 p. 3]. It also determined, however, that Respondent could "assert in his answer the procedural and affirmative defenses raised in his response opposing the motion to amend" [*Id.* at 3].

Having now reviewed the entire State-court record, along with the Parties' pleadings and arguments, the Court is persuaded by Respondent's argument that the four claims identified by Respondent as time-barred are "supported by facts that differ in both time and type from those" ineffective assistance of counsel claims set forth in the initial petition. *See Mayle v. Felix*, 545 U.S. 644, 650 (2005). And Petitioner cannot relate back "entirely distinct" types of ineffective assistance of counsel "merely by raising some type of ineffective assistance in the original petition." *Cox v. Curtin*, 698 F. Supp. 2d 918, 931 (W.D. Mich. 2010). The Court agrees with Respondent that a more expansive reading "would contravene the Supreme Court's warning against construing conduct, transaction, or occurrence so broadly as to render meaningless AEDPA's statute of limitations." *Watkins v. Deangelo-Kipp*, 854 F.3d 846, 850–51 (6th Cir. 2017) (internal quotation marks omitted).

Petitioner alleged six conclusory allegations of ineffective assistance in his initial petition[4] [Doc. 1 p. 5]. In his initial answer, Respondent construed these allegations to encompass any claim for relief that Petitioner raised in State court [Doc. 11 p. 11–20]. But the amended petition's claims of ineffective assistance of counsel based on (1) co-counsel's alleged diminished capacity; (2) failure to introduce exculpatory text messages; (3) cross-examination of Dr. Zimmerman; and (4)

---

[4] These claims were based on counsel's alleged failure to (1) investigate; (2) seek out and interview witnesses; (3) obtain experts; (4) examine physical evidence; (5) object; and (6) subject the prosecution's theory to "the adversarial process" [Doc. 1 p. 5].

18

co-counsel's "crude" and "unprofessional" conduct do not relate back to the claims raised in the original petition.  Therefore, these distinct claims will be dismissed as time-barred.[5]

### 2. Merits Determination

Alternatively, Plaintiff's ineffective assistance claims based on co-counsel's alleged diminished capacity; counsel's failure to introduce exculpatory text messages; and co-counsel's alleged "crude" and "unprofessional" conduct fail on their merits.  These claims were presented to and rejected by the TCCA on post-conviction appeal.  *See Jenkins II*, 2021 WL 979270, at *8–12.  And the adjudication of these claims in State courts fail to warrant relief under 28 U.S.C. § 2254(d).

The standard for assessing these claims is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)[6].  To prove ineffective assistance of counsel, a habeas petitioner must demonstrate: (1) constitutionally deficient performance by counsel, and (2) actual prejudice as a result of such ineffective assistance.  *Strickland*, 466 U.S. at 687.  Deficiency is established when a petitioner can demonstrate that counsel's performance falls below an objective standard of reasonableness as measured by professional norms, such that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Id*. at 687–88.  A reviewing court's scrutiny is to be highly

---

[5] Plaintiff's claim relating to the cross-examination of Dr. Zimmerman is otherwise defaulted, as set forth in Part III.B.1.

[6] Petitioner argues throughout his amended petition that his trial counsel was so ineffective that prejudice should be presumed based on the Supreme Court's holding in *United States v. Cronic*, 466 U.S. 648 (1984) [*See generally* Doc. 12].  In *Cronic*, a case decided the same day as *Strickland*, the Supreme Court held that prejudice should be presumed where (1) there is a complete denial of counsel during a critical stage of trial; (2) where counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing"; or (3) the circumstances surrounding the trial made it so unlikely that any lawyer could provide effective assistance.  *See id*. at 659–60.  But here, the record demonstrates that counsel actively defended Petitioner, and Petitioner has not identified any circumstances rendering the "likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small" that prejudice should be presumed.  *Id.*  Therefore, *Strickland*, rather than *Cronic*, is the correct standard by which to consider Petitioner's ineffective-assistance-of-counsel claims.

19

deferential of counsel's performance, with an effort to "eliminate the distorting effects of hindsight." *Id.* at 689. In fact, counsel is to be afforded a presumption that his actions were the product of "sound trial strategy" and undertaken with the exercise of reasonable professional judgment. *Id*.

The prejudice inquiry "asks whether it is 'reasonably likely' the result would have been different" if counsel's performance had not been deficient. *Richter*, 562 U.S. at 111 (quoting *Strickland*, 466 U.S. at 696). While "[t]his does not require a showing that counsel's actions 'more likely than not altered the outcome,' . . . the difference between *Strickland*'s prejudice standard and a more-probable-than-not standard is slight and matters 'only in the rarest case.'" *Id*. at 111–12 (quoting *Strickland*, 466 U.S. at 693, 697). "The likelihood of a different result must be substantial, not just conceivable." *Id*. at 112. Therefore, merely showing that "a court can[not] be certain counsel's performance had no effect on the outcome" or that "it is possible a reasonable doubt might have been established if counsel acted differently" is insufficient to demonstrate prejudice. *Id*. at 111.

On habeas review, the issue for the district court is not whether the *Strickland* standard is met, but rather, whether the State-court's decision that *Strickland* was not met warrants relief under AEDPA standards. *See Richter*, 562 U.S. at 105 ("When 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."). Accordingly, when a *Strickland* claim has been rejected on its merits by a State court, a petitioner "must demonstrate that it was necessarily unreasonable" for the State court to rule as it did to obtain federal habeas relief. *Cullen v. Pinholster*, 563 U.S. 170, 190 (2011)(applying a "doubly deferential" standard of review of a state court's decision).

20

### a)      Alleged Diminished Capacity of Co-Counsel

On post-conviction appeal, Petitioner argued that co-counsel rendered ineffective assistance, as he was "mentally defective" at trial [Doc. 10-32 p. 7].  Specifically, Petitioner claimed that co-counsel could not remember the court's rulings about the admissibility of the testimony of an unavailable witness, Mark Luttrell; "wandered off" to the State's podium; forgot his questioning of Officer Brewer; was "at sea cross[-]examining Lisa Lotts"; confused jurors during voir dire and witnesses during questioning; permitted State witness, Officer Brewer, to be excused without cross-examination because he confused him with Officer Partin; and failed to have transcriptions prepared of statements he intended to use on cross-examination [Doc. 10-32 p. 7–9].  Petitioner also asserts these claims in his amended federal habeas petition [Doc. 12 p. 58–71].

Upon review of Petitioner's claims, the TCCA held:

> We have reviewed the record and conclude that the Petitioner has failed to demonstrate deficient performance or prejudice based on co-counsel's alleged mental impairment. To the contrary, the record shows that co-counsel was keenly aware of the issues and zealously advocated on behalf of the Petitioner. As relevant here, the record shows that the admissibility of multiple statements by Mark Luttrell, an unavailable witness, was a hotly contested and legally complex issue. Lead counsel had filed pre-trial motions seeking the admissibility of the Luttrell statements, and the trial court reserved ruling on the matter upon hearing further proof at trial. During Investigator Brewer's cross-examination, co-counsel attempted to elicit testimony about the Mark Luttrell statements, and the State objected because co-counsel had not provided an exception for the admissibility of the statement, not because Investigator Brewer was the wrong witness. Moreover, during an out of jury hearing, the record shows that co-counsel sought to admit Luttrell statements during the State's case in chief because the trial court had not yet ruled on the issue. However, the trial court instructed co-counsel that it would be more appropriate to seek admission of the statement during the defense proof and with the proper exceptions. Contrary to the Petitioner's claim, co-counsel argued that the Luttrell statement was indeed admissible to counter the State's allegation that the Petitioner fled the country following the murder. Additionally, later in the defense proof, co-counsel called two investigators, Detective Chad Partin and Investigator George Dyer, to testify on behalf of the Petitioner. Each investigator testified to telling the Petitioner that they did not believe the Petitioner was the killer. While each investigator made the statement to get the Petitioner to

21

discuss the case, it was clear that co-counsel elicited the testimony to rebut the State's flight theory. In other words, co-counsel sought admission of the statement to show that the Petitioner left the State without fear of prosecution because authorities did not believe the Petitioner was the killer.

Moreover, ADA Blount and lead counsel each testified at the post-conviction hearing that there was nothing unusual about co-counsel's conduct during trial. Accordingly, the Petitioner has failed to demonstrate deficient performance, and he is not entitled to relief.

*Jenkins II*, 2021 WL 979270, at *10.

Petitioner argues that the TCCA "misrepresent[ed] facts in the record" when it combined the following two issues: (1) co-counsel "allowed Officer Brian Brewer to leave the stand because he mixed up Brewer for Chad Partin[].  The officer left the courthouse and was not available to be called by the defense to be asked about telling the petitioner that he did not believe the petitioner was guilty of murder"; and (2) co-counsel was not able to present a legal argument for the admissibility of Mr. Luttrell's statement [Doc. 12 p. 65].  Petitioner otherwise maintains that he is entitled to federal habeas relief because the trial transcript "speaks for itself" as to co-counsel's performance [*Id.* at 70].

Petitioner's arguments fail to warrant federal habeas relief.  Lead counsel did elicit the statement Petitioner complains was omitted from trial; it was elicited from Officer Partin, who testified that he told Petitioner, "Dave, you're not a killer, I believe you're not the killer" [Doc. 10-12 p. 101].  And during Mr. Brewer's cross-examination, a conference was held outside the jury's presence about the admissibility of Mr. Luttrell's statement to police through Mr. Brewer's testimony [*See, e.g.*, Doc. 10-9 p. 178–192].  Co-counsel argued that Mr. Luttrell's statement was necessary to show that the Aryan Nation had a hierarchy, and that Petitioner was not a part of that hierarchy [*See, e.g.,* Doc. 10-9 p. 182].  The trial court ruled that counsel could elicit testimony (1) about who ordered the assault and (2) that anyone violating Aryan Nation rules would be punished

[*Id.* at 189]. During the cross-examination of Officer Brewer, co-counsel elicited from Officer Brewer that Mr. Luttrell was upset that two individuals who were not members of the Aryan Nation were allowed to go to the "beat down" of the victim, and that Mr. Luttrell had given the command for the "beat down" [*Id.* at 175, 176, 177]. Additionally, testimony was introduced at trial that that the Aryan Nation was an organization with rules, a command structure, and meetings [*see, e.g.,* Doc. 10-9 p. 14–102], and that Petitioner was not a member of the Aryan Nation [*see, e.g. id.* at 27, 79].

Further, the TCCA's determination of facts as to co-counsel's conduct are borne out by the record and show that that counsel's performance fell "within the wide range of reasonable professional assistance[.]" *Strickland*, 466 U.S. at 689. And Petitioner has not demonstrated that the TCCA's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement." *Richter*, 562 U.S. at 103). Accordingly, the rejection of this claim was neither contrary to, nor did it involve an unreasonable application of, clearly established Supreme Court precedent, and it was not based on an unreasonable determination of facts in light of the evidence presented.

### b)     Allegedly Exculpatory Text Messages

Next, Petitioner argues that counsel was ineffective in failing to present at trial text messages that mentioned Petitioner's co-defendant, Todd Danton, and "reveal[ed] a greater culpability than Mr. Lanier admitted to in his trial testimony" [Doc. 12 p. 94–95]. In rejecting this claim on post-conviction appeal, the TCCA held: "We fail to see, and the Petitioner has not advanced, how the admission of these text messages would have changed the outcome of the trial. The Petitioner failed to establish deficient performance or prejudice, and he is not entitled to relief." *Jenkins II*, 2021 WL 979270, at *12.

23

The record yields that, during the post-conviction evidentiary hearing, Petitioner questioned lead trial counsel about text messages Petitioner found in the discovery of his initial trial counsel, Mr. Isbell [Doc. 10-28 p. 39]. The relevant excerpted portion of what Petitioner read into the record is that "I know what I did was wrong, but my intention was to scare him not kill him[.] [E]veryone else cho[]se that for him. I told Todd to stop[], but he continued[.] [B]ut we all had a part in it[,] and I'll take what I get because I was in the wrong . . . . [Y]es[,] I took someone's life[,] but I won't be afraid to do it again" [*Id.* at 41]. Lead counsel testified that he saw the texts prior to trial and presumed they were from either Mr. Holmes or Mr. Lanier, and that the defense decided not to use the messages, though he could not "tell [Petitioner] what [the reason was] right now" [*Id.* at 42]. Lead counsel noted, however, that the "downside" to the message is that "it lends credibility to the fact that they were involved in [the murder], and of course, there's quite a bit of evidence that puts [Petitioner] among them" [*Id.* at 44].

Courts "should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. And here, counsel testified that he chose not to introduce the messages, noting that the message inculpated Petitioner's co-defendants, with whom Petitioner could be placed on the evening of the murder [Doc. 10-28 p. 42–44]. Under these circumstances, a decision not to introduce the text messages does not fall "below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688.

Further, it is not unreasonable to determine that Petitioner was not actually prejudiced by counsel's failure to introduce these texts. Mr. Holmes and Mr. Lanier both testified Petitioner hit the victim in the head and face with a ball-peen hammer, the victim's blood was found on the front passenger side of the vehicle where witnesses stated Petitioner sat, and Ms. Lotz and Mr. Russell

24

testified that Petitioner made statements to them stating his involvement in the victim's death. *See Jenkins I*, 2017 WL 1425610, at *19. The introduction of the challenged texts would have only demonstrated that one of Petitioner's co-defendants also felt some responsibility for the victim's death; they would not have been exculpatory to Petitioner.

Accordingly, Petitioner has failed to demonstrate that the rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or that it was based on an unreasonable determination of facts in light of the evidence presented.

### c) Co-Counsel's Allegedly Crude, Unprofessional Conduct

Petitioner asserts that co-counsel rendered ineffective assistance of counsel by displaying conduct that (1) was "dismissive of the State"[7]; (2) was "snarky with the court"[8]; (3) was sexist to the jury pool[9]; (4) made a "tasteless" joke that the District Attorney's Office represented Mr. Lanier[10]; (5) harassed the prosecution by sitting next to their table and using their podium[11]; (6) revealed where a State's witness lived during cross-examination[12]; and (7) engaged in one

---

[7] Co-counsel stated, "[W]hat you like is not necessarily important" when the ADA stated he would like to ask a witness a question [Doc. 10-9 p. 78].

[8] Co-counsel asked a witness, "Was he kind of a jackass sort of fellow?" [Doc. 10-9 p. 72]. When the trial court stated the witness did not have "to respond to a curse description," co-counsel stated, "Excuse me, Judge. I'm from Grundy County. I know what a jackass is." [*Id.*].

[9] Co-counsel asked, "Do any men ever sit on the grand jury, or all just women?" [Doc. 10-7 p. 121].

[10] Co-counsel asked State witness, Mr. Lanier, "Have you had ample opportunity to talk to your lawyers over here, [ADAs] Mrs. Lynch and Mr. Blount?" [Doc. 10-9 p. 54].

[11] The court told co-counsel he was at the wrong podium, and co-counsel responded, "Oh, I am? Thank you" [Doc. 10-9 p. 165].

[12] At the end of his cross-examination of Ms. Roulette-Jones, co-counsel stated, "Hope you're doing alright over there in Hopkinsville" [Doc. 10-12 p. 42].

25

exchange with the prosecution in which he suggested they "go outside" and later stated, "I don't care if you disbar me and throw me in jail" [Doc. 12 p. 113–117].

In addressing this claim on post-conviction appeal, the TCCA held:

> We have engaged in an extensive review of the trial transcript and the citations of alleged misconduct of co-counsel by the Petitioner. The gravamen of the Petitioner's complaint here is the alleged unprofessional misconduct of co-counsel, which is more akin to an ethical complaint rather than an abridgement of a constitutional right. . . . To the extent the Petitioner claims co-counsel's comments collectively amount to deprivation of the Sixth Amendment right to counsel, we disagree. While co-counsel's style may have been less than tactful, none of these comments amount to deficient performance. The Petitioner is not entitled to relief on this issue.

*Jenkins II*, 2021 WL 979270, at *9. Petitioner maintains that the TCCA's decision warrants relief, claiming that he was present at trial and observed that co-counsel's conduct evoked "disbelief, distaste, dislike, and annoyance, among other things" [Doc. 12 p. 120]. Petitioner also states it is "absurd" to characterize co-counsel's threats to the prosecutor a "style" of practicing law [*Id.* at 120–21].

But Petitioner's subjective evaluation of co-counsel's performance in his habeas petition is insufficient to serve as proof that co-counsel rendered deficient performance. And a review of the State-court record demonstrates that most of the comments Petitioner complains about were, in fact, quips from co-counsel or trial banter [*See* Doc. 12 p. 113–115, 116–17, 118]. At the post-conviction hearing, the ADA testified that while he "butted heads" with both members of the defense team, he denied that co-counsel's conduct was unprofessional or even out of the ordinary [Doc. 10-27 p. 73, 75–79]. Lead counsel, meanwhile, testified that co-counsel was a "very, very smart man" and that "jurors love him" [Doc. 10-29 p. 77, 78]. Further, co-counsel's alleged threats to the prosecutor and his statement that he did not care if he was disbarred occurred outside of the jury's presence [*Id.* at 42–44, 45–47]. Therefore, the Court finds that Petitioner has not

26

demonstrated deficient performance by counsel that resulted in actual prejudice to his defense. Accordingly, Petitioner has failed to demonstrate that the rejection of this claim was contrary to, or involved an unreasonable application of, clearly established Supreme Court law, or that it was based on an unreasonable determination of facts in light of the evidence presented.

### B. Claims Respondent Asserts are Procedurally Defaulted

### 1. Ineffective Assistance—Cross-Examination of Dr. Zimmerman

Petitioner did not raise in State court his claim that counsel rendered ineffective assistance regarding the cross-examination of Dr. Zimmerman[13] [Doc. 12 p. 99–110; *see also* Doc. 10-32 p. 9–11]. By failing to present this claim to the TCCA, Petitioner failed to exhaust the claim. 28 U.S.C. § 2254(b)(1); *see also* Tenn. S. Ct. R. 39. Because of Tennessee's statute of limitations, waiver rules, and prohibition against successive petitions, there are no longer State remedies available to Petitioner. *See* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule), § 40-30-106(g) (waiver rule). Therefore, this claim is technically exhausted but procedurally defaulted. *See, e.g., Jones*, 696 F.3d at 483.

Petitioner claims that he is actually innocent, and that consideration of—(1) Dr. Wert's suggestion that the victim's approximate time of death was between 11:43 p.m. on March 23, 2013,

---

[13] Within the body of this claim, Petitioner argues that counsel should have hired and called a defense expert to challenge Dr. Zimmerman's testimony as to the victim's time of death [Doc. 12 p. 103]. Petitioner presented the TCCA with a claim that counsel rendered ineffective assistance in failing to obtain a forensic pathologist to testify as an expert as to the victim's time of death [Doc. 10-32 p. 14–16]. The TCCA determined Petitioner had waived the issue by failing to include the issue in his petition for post-conviction relief and by failing to support it with citation. *Jenkins II*, 2021 WL 979270, at *13. The TCCA otherwise found that Petitioner failed to demonstrate deficient performance or prejudice, as "Dr. Zimmerman testified that determining the time of death was not a precise science and that there were difficulties in determining the exact time of the victim's death." *Id.* Therefore, to the extent this argument is intended as a federal habeas claim, it is defaulted on adequate and independent State-law grounds and is otherwise without merit. *See id.*

27

to 2:35 a.m. on March 24, 2013[14]; (2) text message records showing Petitioner was at home texting his girlfriend during the time of death proposed by Dr. Wert; and (3) Cody Lanier's messages to the victim's family showing a greater level of culpability than he admitted at trial—would have changed the jury's verdict [*See, generally*, Doc. 12]. But even if this evidence constitutes "new evidence" as contemplated by *Schlup*, it is not of sufficient character to establish that no reasonable juror considering this evidence would have convicted Petitioner in light of all the evidence. *See House v. Bell*, 547 U.S. 518, 537–38 (2006) ("*Schlup* makes plain that the habeas court must consider "'all the evidence,'" old and new, incriminating and exculpatory" and then make "a probabilistic determination about what reasonable, properly instructed jurors would do." (quoting Schlup, 513 U.S. at 329, 331–332)).

Here, the jury was presented with video evidence that placed Petitioner with Messrs. Holmes, Lanier, Dalton, and the victim together on March 23, 2013 [*See, e.g.*, Doc. 10-9 p. 146–49]. Ms. Roulette-Jones testified at trial that she overheard Mr. Dalton describe the circumstances of the victim's death (and Petitioner's involvement in it) on Saturday, March 23, 2013, sometime between 9:00 and 11:00 p.m. [Doc. 10-12 p. 22–24]. And the Parties entered certain text messages by stipulation, one of which Coty Holmes sent at either 10:11 p.m. or 11:11 p.m. on March 23, 2013, stating, in relevant part, "just got done doing what we had to do broke my hand" [Doc. 10-12 p. 123–24; *see also* p. 144]. Mr. Holmes also testified that he arrived home after the murder at approximately 11:30 p.m. to 12:00 a.m. [*Id.* at 147]. Therefore, proof was presented to the jury that Petitioner was with his co-defendants on the evening of March 23, and that the victim was murdered sometime late that evening.

---

[14] During his post-conviction proceedings, Petitioner introduced Officer Chad Luttrell's "Offense Report[,]" which noted the victim's time of death occurred between 11:43 on March 23, 2013, and 14:35 on March 24, 2013 [Doc. 10-26 p. 25]. This time of death was determined by Franklin County Medical Examiner, Dr. Wert, who responded to the crime scene and pronounced death [*See id.* at 59–60].

And aside from the timing of the murder, Mr. Holmes and Mr. Lanier both testified Petitioner hit the victim in the head and face with a ball-peen hammer, the victim's blood was found on the front passenger side of the vehicle where witnesses stated Petitioner sat, and Ms. Lotz and Mr. Russell testified that Petitioner made statements to them stating his involvement in the victim's death. *See Jenkins I*, 2017 WL 1425610, at *19. Therefore, even if evidence had been presented at trial that the victim could have died later in the evening at a time Petitioner could prove he was at home, and that Cody Lanier stated his responsibility in the victim's death via text message, the Court cannot say that no reasonable juror would vote to convict Petitioner in light of all the evidence. *See House*, 547 U.S. at 537–38. Accordingly, Petitioner may not rely on the "actual innocence" exception to overcome these procedural issues, and this claim will be dismissed as untimely and procedurally defaulted.

### 2. Independent and Adequate State Procedural Grounds

#### a. Ineffective Assistance—Failure to Object to Roulette-Jones' Testimony about Christopher "Shorty" Bryan's Death

At trial, after the prosecution asked Ms. Roulette-Jones to tell the Court why Shorty was not at the trial, the following transpired:

A.    An ex-Aryan Nation gave him a pill.

Q.    Okay. Did he ever recover from taking that pill?

A.    No.

[Doc. 10-12 p. 31]. Petitioner alleges that counsel's failure to object to Ms. Roulette-Jones' testimony about the circumstances surrounding Christopher "Shorty" Bryan's death and alleged prosecutorial misconduct in introducing it was ineffective assistance [*See* Doc. 12 p. 126–138].

Petitioner presented this claim to the TCCA in his post-conviction appeal [*see* Doc. 10-32 p. 17], but the TCCA declined to address it because Petitioner "failed to cite the record or provide

any legal authority in support of this claim[.]" *Jenkins II*, 2021 WL 979270, at *13–14. Although

the TCCA did not directly cite the rule it was invoking to procedurally bar relief, it cited Tennessee

Rule of Appellate Procedure 27(a)(7)(A)[15] and Tennessee Court of Criminal Appeals Rule 10(b)[16]

earlier in its opinion for the same proposition. *See id.* at *13. And the Court agrees with

Respondent that it is reasonable to find that the TCCA invoked and applied the same rules here,

too. *See id.* Thus, there was "a state procedural rule with which the petitioner failed to comply[,]"

and the State court "actually enforced the state procedural sanction[.]" *Monzo*, 281 F.3d at 576.

The Sixth Circuit has held these rules are "adequate and independent state procedural ground[s]

upon which the state court actually relied to bar consideration of the" federal constitutional claim.

*Id.* at 577; *see also Middlebrooks v. Bell*, 619 F.3d 526, 535–36 (6th Cir. 2010) (collecting

Tennessee cases establishing this proposition), *vacated on other grounds sub nom. Middlebrooks*

*v. Colson*, 566 U.S. 902 (2012). Accordingly, this claim is defaulted and may be considered only

if Petitioner can demonstrate cause for the default and resulting prejudice, or that a fundamental

miscarriage of justice will result if the Court fails to consider it.

     The Court has already determined that Petitioner cannot satisfy the fundamental-

miscarriage-of-justice exception. And the TCCA alternatively rejected this claim on its merits for

Petitioner's failure to establish that he was prejudiced by the admission of this testimony. *Jenkins*

*II*, 2021 WL 979270, at *14; *see also Strickland*, 466 U.S. at 687. Specifically, the TCCA noted

that (1) Petitioner had not put forth any proof at the post-conviction hearing "that defense trial

---

[15] "The brief of the appellant shall contain . . . [a]n argument . . . including the reasons why the contentions require appellate relief, with citations to the authorities and appropriate references to the record[.]" Tenn. R. App. P. 27(a)(7)(A).

[16] "Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b).

counsel were aware of the circumstances" of "Shorty" Bryan's death (2) the testimony "was unsolicited by the prosecution, non-responsive, and isolated"; and (3) the testimony "did not implicate the Petitioner in Bryan[]'s death or suggest that the Petitioner was involved." *Jenkins II*, 2021 WL 979270, at *14. These conclusions are borne out by the record. Therefore, this claim is defaulted and otherwise without merit[17], and it will be dismissed.

### b. Tennessee Rule of Evidence 404 Violations

Petitioner argues that certain "bad act" evidence was introduced at his trial in violation of Tennessee Rule of Evidence 404(b)[18] [Doc. 12 p. 232–33]. According to Petitioner, this included testimony that Petitioner (1) was a member of the Aryan Brotherhood, a "violent" and "dangerous" organization; (2) had committed seven other murders; (3) had committed murder and cannibalism in New Jersey; (4) was on drugs; and (5) "was at least obliquely responsible for the murder of Christopher 'Shorty' Bryan" [*Id.*].

These allegations were not presented on Petitioner's direct appeal when they should have been [*See* Doc. 10-17]. This resulted in their waiver when the TCCA considered these claims on post-conviction appeal. *See Jenkins II*, 2021 WL 979270, at *15. The TCCA did not cite to any particular statute, but it found Petitioner had waived his 404(b) claim "based on the failure to raise it on direct appeal, the failure to present proof of this issue at the post-conviction hearing, and the

---

[17] Though the TCCA decided this claim on prejudice grounds, there was no deficient performance by counsel with regard to this claim, either. An objection could have drawn more attention to this "isolated" testimony. *Jenkins II*, 2021 WL 979270, at *14; *Schauer v. McKee*, 401 F. App'x 97, 101 (6th Cir. 2010) ("[N]ot drawing attention to [a] statement may be perfectly sound from a tactical standpoint." (quoting *United States v. Caver*, 470 F.3d 220, 244 (6th Cir. 2006))). Therefore, the TCCA's alternative holding withstands federal habeas review, as well.

[18] Tennessee Rule of Evidence 404(b) provides, as relevant here, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes."

failure to support this issue with citation to the record or legal authority." *Id.*

Tenn. Code Ann. § 40-30-106(g) instructs that a "ground for relief is waived if the petitioner personally or through an attorney failed to present it for determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented[.]"  As noted by the TCCA in its post-conviction appeal, the first court of competent jurisdiction Petitioner could have raised these issues to was the TCCA on direct appeal.  *Id.*  Thus, the TCCA clearly applied the waiver rule.  And the Sixth Circuit has determined that this procedural rule is an adequate and independent state ground for procedural default purposes. *See, e.g., Coe v. Bell*, 161 F.3d 320, 331 (6th Cir. 1998); *see also Hollis v. Perry*, No. 3:17-cv-626, 2018 WL 6181354, at *30 (M.D. Tenn. Nov. 27, 2018).  Therefore, this claim is defaulted, and Petitioner "must demonstrate that there was cause for his failure to follow the rule and that actual prejudice resulted from the alleged constitutional error" to excuse it.  *Monzo*, 281 F.3d at 576.

Petitioner cannot establish "that actual prejudice resulted from the alleged constitutional error" because his claim is not constitutional; it is a matter of state evidentiary law.  *Id.*  "Claims that the state courts misapplied Tennessee statutes, evidentiary and procedural rules, and case law during the trial are not cognizable in a federal habeas corpus petition." *Luellen v. Hall*, No. 2:13-cv-2445, 2019 WL 13260269, at *27 (W.D. Tenn. Feb. 20, 2019) (citing *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")).  Therefore, claims based on alleged violations of Tennessee Rule of Evidence 404(b) "are not cognizable grounds for federal habeas relief." *Okraku v. Chapman*, No. 4:18-cv-22, 2020 WL 1281238, at *6 (E.D. Tenn. Mar. 17, 2020) (finding claim brought pursuant to Tenn. R. Evid. 404(b) not cognizable).

32

Moreover, as the Court has previously noted, Petitioner has failed to demonstrate an entitlement to the fundamental-miscarriage-of-justice exception. Accordingly, Petitioner's Rule 404(b) claims will be dismissed as defaulted and otherwise not cognizable. *See* 28 U.S.C. § 2254(a) (permitting court to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States").

### 3. Prosecutorial Misconduct Claims

Petitioner raises the following prosecutorial misconduct claims in his amended petition: (1) "subornation of perjury" regarding Ms. Roulette-Jones' and Agent Frizell's testimonies [Doc. 12 p. 175–209]; (2) improper argument by the prosecution, namely, that the prosecution used inflammatory language, vouched for witnesses, asserted facts not in evidence, misstated material facts, alleged prior bad acts, and painted Petitioner as violent and without conscience [*Id.* at 210–231]; (3) that the prosecution failed to disclose all Corey Lanier's statements, the nature of their agreement with Mr. Russell, and factors related to the credibility of Ms. Lotz and Ms. Roulette-Jones [*Id.* at 236–238]; and (4) "disregard for due process" by vouching for the credibility of witnesses, leading witnesses, and entering irrelevant and prejudicial evidence [*Id.* at 238–239].

Petitioner first raised his prosecutorial misconduct claims on post-conviction appeal [Doc. 10-32 p. 26–33; *see also* Doc. 10-17]. Respondent argues that this presentation failed to properly exhaust the claims, however, as Petitioner had already waived them by failing to raise them during his direct appeal before the TCCA [Doc. 31 p. 15–16, citing Tenn. Code Ann. § 40-30-106(g)]. By failing to present the claims "in the manner that state law requires[,]" Respondent contends, Petitioner's prosecutorial misconduct claims are procedurally defaulted on federal habeas review [*Id.*, quoting *Edwards v. Carpenter*, 529 U.S. 446, 451–52 (2000)].

33

But "[t]he mere existence of a basis for a state procedural bar does not deprive [federal courts] of jurisdiction; the state court must have actually relied on the procedural bar as an independent basis for its disposition of the case." *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985); *see also Coleman*, 501 U.S. at 735 (holding procedural default doctrine is not applicable unless the state court's judgment "clearly and expressly" relied on a procedural bar). And in Petitioner's case, the TCCA stated:

> The State argues that this issue is waived because the Petitioner does not specifically identify the supposedly objectionable testimony or argument, nor does he cite to any portion of the record where this occurred. In any event, the State contends, and we agree, that the Petitioner is not entitled to relief.

*Jenkins II*, 2021 WL 979270, at *16. The Court does not find that the TCCA unambiguously relied on a procedural bar to dispose of Petitioner's claims, as the use of "[i]n any event" in the opinion may be reasonably read to find both that the TCCA was enforcing the waiver or waiving it. And the fact "that the state court clearly went on to reject the federal claim on the merits" after using such ambiguous language permits this Court's review of the merits. *Harris v. Reed*, 489 U.S. 255, 266 n.13 (1989). Out of an abundance of caution, the Court does so here.

Under the test for prosecutorial misconduct, "[t]he relevant question is whether the prosecutors' [misconduct] 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974)). The Supreme Court has emphasized that a habeas court's review is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly*, 416 U.S. at 642). Plus, the prosecutor's conduct is reviewed in the context of the entire trial record. *Donnelly*, 416 U.S. at 639–43. Therefore, "to make out a prosecutorial misconduct claim, one must first demonstrate that the prosecutor's conduct and remarks were improper, and then must demonstrate that the impropriety was flagrant and thus violated the

34

[Petitioner]'s due process rights." *Hamilton v. Jackson*, 416 F. App'x 501, 506 (6th Cir. 2011)

(citing *Macias v. Makowski*, 291 F.3d 447, 452 (6th Cir. 2002)). "Flagrancy is analyzed by

weighing [1] whether the prosecutor's conduct tended to mislead the jury or prejudice the accused,

[2] whether it was isolated or extensive, [3] whether it was deliberate or accidental, and [4] the

strength of the evidence against the defendant." *Id.* (citing *United States v. Carroll*, 26 F.3d 1380,

1385 (6th Cir. 1994)).

On post-conviction appeal, the TCCA stated as follows:

The Petitioner claims he is entitled to post-conviction relief based on trial counsel's failure to object to various grounds of prosecutorial misconduct including the failure to disclose the second statement by co-defendant Lanier, the failure to disclose the nature of the State's agreement with Josh Russell, the failure to disclose that Lisa Lotz was "a professional informant," and that the failure to disclose that Tabitha Roulette Jones was "mentally ill" based on her alleged disability status. The Petitioner also generally argues that the State "disregard[ed] due process" and "suborn[ed] perjury." In support of this issue, the Petitioner points to certain testimony as evidence of the State's suborning of perjury including Jones's testimony concerning the circumstances of Bryan[]'s death, George Dyer's testimony that he had no opportunity to test the Petitioner's clothing, and Russell's testimony that he did not have a deal with the State. The Petitioner insists that his conviction was based on evidence known to be false by the State. He also argues the State engaged in improper opening statement when co-counsel stated, "You will hear from Coty Holmes and Corey Lanier. They've also been charged for their involvement in the death of Corey Mathews. They worked a deal with the State for their truthful testimony." The Petitioner further contends that the State improperly vouched for the credibility of codefendants Holmes and Lanier in closing by stating that "they gave their truthful statements that implicated themselves."

\*\*\*

As previously discussed above, lead counsel received the second statement of co-defendant Lanier and was able to utilize it at trial. Lotz also testified at trial that she received a reward of $200 from law enforcement in Hobbs and $2,500 from the TBI as a result of the Petitioner's arrest. She was unaware that there was a reward for information leading to the Petitioner's arrest prior to reaching out to law enforcement. Other than the Petitioner's statements and argument, there was no evidence at the post-conviction hearing concerning Lisa Lotz or Jones as to this issue. We additionally conclude, based on our prior discussion above, that the State did not suborn perjury in this case. Finally, we have reviewed the opening and closing statements of the prosecutors in this case and conclude that the Petitioner has failed to establish prosecutorial misconduct. He is not entitled to relief as to the issue.

35

*Jenkins II*, 2021 WL 979270, at *16.

The TCCA's decision is supported by the record. Petitioner has not demonstrated that the prosecution engaged in improper conduct or made improper remarks that would render "the entire trial fundamentally unfair" so as to constitute prosecutorial misconduct, particularly in light of the evidence of Petitioner's guilt. Accordingly, Petitioner has failed to demonstrate that the decision rejecting these claims is contrary to, or involves an unreasonable application of, clearly established Supreme Court law, or that it is based on an unreasonable determination of facts in light of the evidence presented.

### C. Properly Exhausted Ineffective Assistance Claims

Petitioner alleges several timely and properly exhausted claims that trial counsel rendered ineffective assistance. As previously noted, the standard for assessing these claims is set forth in *Strickland v. Washington*, which requires a habeas petitioner asserting ineffective assistance of counsel to demonstrate a constitutionally deficient performance by counsel that resulted in actual prejudice. 466 U.S. at 687.

### 1. Cross-Examination of Agent Frizzell

Petitioner claims trial counsel was ineffective when cross-examining Agent Frizzell relating to the cell phone records[19] [Doc. 12 p. 15–41]. In post-conviction proceedings before the

---

[19] Woven in Petitioner's ineffective-assistance claims is a *Strickland* claim based on counsel's failure to object to Agent Frizzell's alleged perjury concerning the cell phone records [Doc. 12 p. 35, 138–40]. But Petitioner did not present this claim to the TCCA on post-conviction appeal [*See generally* Doc. 10-32]. Because of Tennessee's statute of limitations, waiver rules, and prohibition against successive petitions, there are no longer State remedies available to Petitioner. *See* Tenn. Code Ann. § 40-30-102(a) (one-year limitation period), § 40-30-102(c) ("one petition" rule), § 40-30-106(g) (waiver rule). Therefore, this claim is technically exhausted but procedurally defaulted. *See, e.g., Jones*, 696 F.3d at 483. And the equitable exception for reviewing defaulted ineffective-assistance-of-counsel claims is inapplicable in this case, as Petitioner elected to proceed pro se during post-conviction proceedings. *See Martinez v. Ryan*, 566 U.S. 1, 16 (2012) (holding the ineffective assistance of post-conviction counsel may, under

36

TCCA, Petitioner raised this claim as one for ineffective assistance for failure to investigate Petitioner's cell phone records for use at trial [Doc. 10-32 p. 14].

To that end, the TCCA examined the claim relating to Petitioner's cell phone usage and determined that trial counsel "laboriously reviewed" the cell phone records he obtained but did not find any activity for the period when the victim was killed. *Jenkins II*, 2021 WL 979270, at \*13. Although trial counsel did not have the "Cellebrite extraction report" that Petitioner's first attorney had, Agent Frizzell reviewed the report and confirmed that "there was no text message activity during the relevant time frame" of the murder. *Id*. Thus, the TCCA denied relief based on both *Strickland* prongs. *Id.*

Petitioner challenges the State court's decision based on its determination of the facts. *See* 28 U.S.C. § 2254(d)(2). He claims Agent Frizzell either committed perjury or intentionally misled the jury about Petitioner's cell phone activity by testifying that there was no relevant activity on Petitioner's cell phone during the time of the murder [Doc. 12 p. 17–18]. Petitioner believes that his text messages on the day of the murder show the falsity of Agent Frizzell's testimony and trial counsel's ineffectiveness in investigating and exploiting this issue during cross-examination [*Id.* at 17–21].

However, the State courts did not base the denial of relief as to this claim on an unreasonable determination of fact. During Petitioner's post-conviction evidentiary hearing, the court asked Agent Frizell whether it was possible to "locate somebody on the ground" through "texting information" at the time of the murder in 2013 [Doc. 10-28 p. 109]. Agent Frizzell

---

limited circumstances, qualify as cause to excuse the procedural default of ineffective assistance-of-trial counsel claims). Nevertheless, the claim lacks merit because of the "overwhelming" amount of evidence establishing Petitioner's guilt. *Jenkins I*, 2017 WL 1425610, at \*19. Thus, there is no reasonable probability of a different trial outcome if counsel objected to the purported perjury. *Strickland*, 466 U.S. at 694.

37

testified that it was "probably not" possible to do so and with the Verizon tower records, it was "just not possible" to do so [*Id.*]. This testimony negates Petitioner's challenge to counsel's alleged failure to investigate, as counsel cannot be faulted for failing to follow up on a potential lead that was "just not possible" [*Id.*]. And since only voice communications could be tracked, the exchange of text messages (even those occurring during the time surrounding the murder), does not establish ineffective assistance by exculpating Petitioner, because Agent Frizzell would not have been able to determine Petitioner's location from those records. Further, Petitioner concedes that Agent Frizzell acknowledged during trial that Petitioner's phone could have been used for texting during the relevant time frame, so the jury was not misled on that issue [Doc. 12 p. 37].

Additionally, the TCCA held that Petitioner failed to establish deficient performance because trial counsel thoroughly examined the records and did not find activity during the relevant time frame of the victim's death. *Jenkins II*, 2021 WL 979270, at *13. And while Agent Frizzell testified during trial that Petitioner's cell phone did not "register after 10:10 a.m." meaning the phone was "either turned off or in a 'dead spot[,]'" *Jenkins I*, 2017 WL 1425610, at *10, he confirmed at the post-conviction hearing the existence of text messages on Petitioner's phone at 4:00 p.m. and 5:46 p.m. of the day of the offense but noted that "there was no text message activity during the relevant time frame when the victim was killed." *Jenkins II*, 2021 WL 979270, at *13. So, although Frizzell noted the existence of text messages, these messages did not exculpate Petitioner. Since further investigation and use of these text messages was irrelevant to the defense, it was not deficient performance for counsel to not further investigate this point for trial.

And Petitioner cannot establish prejudice as a result of counsel's performance given the evidence presented against him at trial, such as his co-defendants' testimonies about the killing

and Ms. Lotz and Mr. Russell's testimony that he gave them detailed confessions, *see generally Jenkins I*, 2017 WL 1425610, at *1–13, and the generally unhelpful nature of the phone records, *See Jenkins II*, 2021 WL 979270, at *5–6 (summarizing trial counsel and Agent Frizzell's testimonies).

Accordingly, the decision rejecting this claim is not contrary to, or based on an unreasonable application of, *Strickland* or its progeny, and it was not based on an unreasonable determination of facts in light of the evidence presented.

### 2. Investigation and Cross-Examination of Agent Bottrell

Petitioner argues that he is entitled to federal habeas relief based on the TCCA's adjudication of his claim that trial counsel rendered ineffective assistance relating to the investigation and cross-examination of Agent Bottrell [Doc. 12 p. 42–57]. The TCCA decided this claim by noting that Petitioner presented "no proof" of "alleged deficient performance" at his evidentiary hearing. *Jenkins II*, 2021 WL 979270, at *10–11. The TCCA stated that "Special Agent Maureen Bottrell testified at trial and at the post-conviction hearing that the soil samples taken from the offense location did not match the Petitioner's boots." *Id.* at 11. Thus, the TCCA noted that Agent Bottrell's testimony did not connect Petitioner "directly or circumstantially" to the crime scene, which obviated the need for counsel to cross-examine her. *Id.*

The TCCA's performance holding is supported by the finding that Petitioner elicited no proof of deficient performance concerning this cross-examination. *Id.* at *11. At trial and the evidentiary hearing, Agent Bottrell testified "that the soil samples taken from the offense location did not match the Petitioner's boots." *Id.* [*See* Doc. 10-11 p. 101–02; Doc. 10-27 p. 37–38, 45–46]. Observing that this testimony did not assist the State's case at trial, the TCCA opined that "a well-seasoned trial lawyer recognizes when a witness has not dealt their case any blows, which

39

relieves the need for cross-examination" and that it "suspect[ed], based on [Agent Bottrell's] testimony at trial, that to be the case here." *Jenkins II*, 2021 WL 979270, at *11.  The decision to refrain from cross-examining Agent Bottrell under these circumstances appears a matter of sound trial strategy.  *Strickland*, 466 U.S. at 689 (holding that since "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. . . the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy'") (citation omitted).

As to the prejudice holding, the TCCA correctly noted that Agent Bottrell's testimony did not connect Petitioner "directly or circumstantially to the victim's death." *Id.*  Thus, Petitioner has not demonstrated how this testimony was prejudicial to his defense.

Accordingly, the decision rejecting this claim is not contrary to, nor was it based on an unreasonable application of, *Strickland* or its progeny, nor was it based on an unreasonable determination of facts in light of the evidence presented.  Petitioner is not entitled to relief on this claim.[20]

### 3. Cross-Examination of Lanier

Petitioner contends that trial counsel was ineffective in cross-examining his co-defendant, Corey Lanier[21] [Doc. 12 p. 72–98].  On post-conviction appeal, Petitioner presented the TCCA

---

[20] Petitioner also makes prosecutorial-misconduct allegations under this section [Doc. 12 p. 44–45].  But Petitioner did not exhaust this legal and factual support with the claim during his post-conviction appeal [*See generally* Doc. 10-32].  Therefore, these allegations are defaulted insofar as Petitioner uses them to support his *Strickland* claim.  *See Wong v. Money*, 142 F.3d 313, 322 (6th Cir. 1998) (holding claim must "be presented to the state courts under the same theory in which it is later presented in federal court").

[21] Petitioner incorporates into this claim a related argument of ineffective assistance for counsel's "fail[ure] to present exculpatory evidence[,]" specifically, "text messages which in their entirety reveal a greater culpability tha[n] Mr. Lanier admitted to in his trial testimony" [Doc. 12 p. 94–95].  As the Court previously found, this claim is untimely.  Nevertheless, Petitioner has not shown that the TCCA's decision rejecting this is contrary to, or involves an unreasonable

with a claim that counsel failed to effectively cross-examine Mr. Lanier "because he did not have *Jencks*[22] material[] and did not have a transcription of Lanier's statements"[23] [Doc. 10-32 p. 9].

The TCCA determined that counsel did not provide deficient performance in cross-examining Mr. Lanier, because defense counsel knew about Mr. Lanier's second statement to police, received that statement before trial, and "were prepared" for Mr. Lanier's testimony, including any impeachment testimony that might have been necessary from that second statement. *Jenkins II*, 2021 WL 979270, at *11.

At the post-conviction evidentiary hearing, trial counsel testified that he and co-counsel had Mr. Lanier's initial police statement, "suspected" a second statement existed, received the second statement "in the last two or three days before trial[,]" questioned Mr. Lanier from notes he took after listening to the statement, and could have impeached Mr. Lanier using his notes or a recording of the interview "if it had been called for" [Doc. 10-28 p. 6–8].

Therefore, the record supports the TCCA's factual findings underlying its performance

---

application of, *Strickland* or its progeny, nor has he demonstrated that it is based on an unreasonable determination of facts in light of the evidence presented. *See Jenkins II*, 2021 WL 979270, at *12 (noting counsel not questioned at the evidentiary hearing about his decision to not admit the texts at trial, and Petitioner "has not advanced[] how the admission of these text messages would have changed the outcome of the trial").

[22] In federal prosecutions, the Jencks Act requires the prosecution to provide statements of their witnesses upon completion of the direct examination of the witness. *See* 18 U.S.C. § 3500. Tennessee has a counterpart to the Jencks Act, Rule 26.2(a) of the Tennessee Rules of Criminal Procedure, which requires Petitioner's counsel to make a motion requesting any statements of the witness after his or her direct examination.

[23] Any legal or factual support beyond this point is procedurally defaulted here, because Petitioner did not present that support with this claim to the TCCA on post-conviction appeal, and further state-court review would be barred by waiver under Tenn. Code Ann. § 40-30-106(g). *See also Wong*, 142 F.3d at 322 (holding claim must "be presented to the state courts under the same theory in which it is later presented in federal court").

analysis. Further, this accredited testimony shows that counsel's performance fell "within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, and it provided sufficient justification for the state-court adjudication, *Woods v. Donald*, 575 U.S. 312, 316 (2015) (holding that to demonstrate an unreasonable application of Supreme Court holdings, "a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fair-minded disagreement.'" (quoting *Richter*, 562 U.S. at 103).

Accordingly, the decision rejecting this claim is not contrary to, nor was it based on an unreasonable application of, *Strickland* or its progeny, and it was not based on an unreasonable determination of facts in light of the evidence presented.

### 4. Failure to Object to Roulette-Jones' Testimony re: Dalton's Statement

Petitioner contends he received ineffective assistance of trial counsel when counsel failed to object to Ms. Roulette-Jones' testimony based on *Crawford v. Washington*, 541 U.S. 36 (2004)[24] and *Bruton v. United States*, 391 U.S. 123 (1968)[25], "regarding an out of court statement made by co-defendant Todd Dalton, implicating the Petitioner" [Doc. 12 p. 141–172]. The TCCA addressed this claim on post-conviction appeal as follows:

> The Petitioner next claims that trial counsel was deficient because he failed to object based on *Crawford v. Washington*, 541 U.S. 36 (2004) or *Bruton v. United States*, 391 U.S. 123 (1968), regarding an out of court statement made by co-defendant Todd Dalton, implicating the Petitioner. As we understand this claim, the Petitioner argues that trial counsel was deficient in failing to object to the testimony

---

[24] In *Crawford*, the Supreme Court held that the Confrontation Clause bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." 541 U.S. at 53–54.

[25] In *Bruton*, the Court held that "[a]n accused is deprived of his rights under the Confrontation Clause when the confession of a nontestifying codefendant that implicates the accused is introduced into evidence at their joint trial . . . even if the jury is instructed to consider the confession only as evidence against the codefendant." *United States v. Cope*, 312 F.3d 757, 780–81 (6th Cir. 2002) (citing *Bruton*, 391 U.S. at 137).

of Tabatha Roulette Jones regarding the conversation she overheard between Christopher "Shorty" Bryan[] and Todd Dalton, discussing the murder of the victim. In response, the State initially argues waiver because the Petitioner failed to include this issue in his original or amended petition for post-conviction relief. Waiver notwithstanding, the State contends the Petitioner misapprehends the law as there was no *Bruton* violation for trial counsel to object to in this case because the Petitioner was not tried jointly with co-defendant Dalton. The State further contends that there was no violation of the confrontation clause under *Crawford* because "[co-defendant] Dalton's statements to his friends, overheard by [Jones], were not 'testimonial[.]' " Upon our review, the State correctly observes that the Petitioner has waived any *Bruton* claim for failure to include it in his original or amended petition for post-conviction relief.

To the extent that the Petitioner has raised a deficiency claim based on trial counsel's failure to lodge an objection based on *Crawford*, the Petitioner is not entitled to relief. On direct appeal, the Petitioner argued that the trial court erred in admitting Jones's testimony regarding statements that she overheard co-defendant Dalton make to Christopher "Shorty" Bryan[] about the details of the victim's death. Instead of a confrontation clause challenge under *Crawford*, the Petitioner maintained that co-defendant Dalton's statements were inadmissible hearsay and that the trial court erred in finding that co-defendant Dalton's statements qualified as statements against interest pursuant to Tennessee Rule of Evidence 804(b)(3). *David G. Jenkins*, 2017 WL 1425610, at *21. In denying relief, this court noted that co-defendant Dalton had asserted his Fifth Amendment privilege against self-incrimination and was therefore unavailable. We also rejected the Petitioner's argument that statements to a fellow member of the Aryan Nation with no expectation that Jones would overhear the conversation and with no "perception that his statements [would] expose him to criminal liability" was unreliable or contrary to Rule 804(b)(3). *Id.* at *22.

The threshold question in every case where the Confrontation Clause is relied upon as a bar to the admission of an out-of-court statement is whether the challenged statement is testimonial. *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014) (citing *State v. Cannon*, 254 S.W.3d 287, 301 (Tenn. 2008)). We conclude that Jones's in court testimony concerning what she overheard co-defendant Dalton say about the victim's death was non-testimonial hearsay, which does not run afoul of *Crawford*. Accordingly, the Petitioner is not entitled to relief.

*Jenkins II*, 2021 WL 979270, at *14.

Examining *Bruton* first, the TCCA expressly held that Petitioner had waived any *Bruton* claim for failing to include it in his original or amended petition for post-conviction relief. *Id.* By doing so, the court implicitly invoked Tenn. Code Ann. § 40-30-104(d), which requires a petitioner

to "include all claims known to [him] for granting post-conviction relief" in the petition. This rule constitutes an independent and adequate state-law ground for procedural default purposes. *See Patel v. Washburn*, No. 3:19-cv-489, 2022 WL 1207143, at *13 (M.D. Tenn. Apr. 22, 2022), *report and recommendation adopted in part*, No. 3:19-cv-489, 2024 WL 4817148 (M.D. Tenn. Nov. 18, 2024).

And Petitioner cannot demonstrate prejudice to excuse the default. "*Bruton* is of course authority for the proposition that the use in criminal trials of the confession of a non-testifying co-defendant, which confession implicates another defendant then on trial, is a violation of the latter defendant's Sixth Amendment confrontation rights[.]" *Kelley v. Rose*, 346 F. Supp. 83, 87 (E.D. Tenn. 1972). Notably, *Bruton* does not apply to non-testimonial[26] statements made by a co-defendant, and "even if *Bruton* did apply to nontestimonial statements," it would not apply if the defendant was not jointly tried along the declarant co-defendant. *United States v. Johnson*, 581 F.3d 320, 325–26 (6th Cir. 2009) (dismissing a *Bruton* challenge on both points). And here, the TCCA decided that Dalton's statements were non-testimonial, *Jenkins II*, 2021 WL 979270, at *14, and he was not tried alongside Petitioner. Accordingly, Petitioner's *Bruton* claim is defaulted and otherwise meritless.

As to Petitioner's *Crawford* allegation, the TCCA determined that "Jones's in court testimony concerning what she overheard co-defendant Dalton say about the victim's death was non-testimonial hearsay, which does not run afoul of *Crawford*." *Jenkins II*, 2021 979270, at *14.

---

[26] "In determining whether statements are testimonial, we ask whether the declarant 'intend[ed] to bear testimony against the accused.' This, in turn, depends on 'whether a reasonable person in the declarant's position would anticipate his statement being used against the accused in investigating and prosecuting the crime.'" *United States v. Johnson*, 581 F.3d 320, 325 (6th Cir. 2009) (quoting *United States v. Cromer*, 389 F.3d 662, 675 (6th Cir. 2004) (internal citations omitted).

44

In support of its decision, the TCCA cited *State v. Dotson*, 450 S.W.3d 1, 63 (Tenn. 2014), which relied on *Crawford* and noted that "[w]here nontestimonial hearsay is at issue, it is wholly consistent with the Framers' design to afford the States flexibility in their development of hearsay law[.]" *Id.* (quoting *Crawford*, 541 U.S. at 68).

Thus, the TCCA correctly cited and applied *Crawford* and based its decision on reasonably determined facts in light of the evidence presented. Petitioner is not entitled to relief on this claim.

### D.     *Massiah/Giglio*

Petitioner alleges that the prosecution violated the doctrines set forth in *Massiah v. United States*, 377 U.S. 201 (1964) and *Giglio v. United States*, 405 U.S. 150 (1972), by calling "[p]rofessional informant[,] Joshua Russell" to give testimony that Petitioner told him about the murder [Doc. 12 p. 233–36]. On post-conviction appeal, the TCCA recounted Mr. Russell's testimony as follows:

> At trial, Russell testified that while incarcerated with the Petitioner, the Petitioner told him details about the murder. *David G. Jenkins*, 2017 WL 1425610, at *12–13. Russell also testified that he was incarcerated for a pending charge of sale and delivery of a Schedule IV drug. He stated that he did not have a firm agreement with the State on the resolution of his charges in exchange for his testimony at trial. While he did not receive any promises from the State in exchange for his testimony, his sentencing hearing on his charge was postponed until after he testified at the Petitioner's trial. Russell was originally charged with selling drugs in a school zone, but that charge was dismissed. He previously had been charged with escape after missing a head count at a halfway house. He had three prior convictions for drug trafficking in Kentucky.

*Jenkins II*, 2021 WL 979270, at *15. The TCCA cited and applied the governing federal precedents and decided that "[t]o the extent that there was any proof offered at the post-conviction hearing in support of this issue, it was consistent with the testimony at trial." *Id.* Thus, it determined Petitioner failed to prove a constitutional violation under *Massiah* or *Giglio*. *Jenkins II*, 2021 WL 979270, at *15.

In *Massiah*, the Supreme Court held that a state violates a defendant's Sixth Amendment right to counsel when it deliberately elicits incriminating statements from a defendant after indictment and in the absence of counsel. 377 U.S. at 206. This rule applies either whether the government recruits a jailhouse informant, or where it "intentionally create[es] a situation likely to induce [a defendant] to make incriminating statements without the assistance of counsel." *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) (quoting *United States v. Henry*, 447 U.S. 264 (1980)).

And *Giglio* requires the prosecution to disclose impeachment material, which includes promises made to witnesses in exchange for their cooperation. *United States v. Fort*, 55 F. App'x 222, 224 (6th Cir. 2002) (citing *Giglio*, 405 U.S. at 154–55). To make out a *Giglio* violation, a petitioner must show that the prosecution suppressed evidence favorable to the defense that was "material." *United States v. Warshak*, 631 F.3d 266, 300 (6th Cir. 2010). But speculative or conclusory allegations of a failure to disclose does not satisfy the petitioner's burden of proof. *See Jimenez v. United States*, No. 5:13-cr-45, 2018 WL 3018218, at *2 (W.D. Ky. Mar. 22, 2018) (citing *Murphy v. Johnson*, 205 F.3d 809, 814 (5th Cir. 2000)).

At Petitioner's trial, Mr. Russell testified that he did not have an agreement with the prosecution for his testimony, although his sentencing hearing was postponed until after Petitioner's trial and a serious drug charge was dismissed [Doc. 10-12 p. 55–56, 67–68]. And at Petitioner's post-conviction hearing, Assistant District Attorney Lynch testified that she was not aware of any agreement between Mr. Russell and the State in exchange for his testimony, and that she did not know why his sentencing was postponed until after Petitioner's trial [Doc. 10-29 p. 37–39].

46

The TCCA decided that "any proof" that was adduced at the post-conviction evidentiary hearing "was consistent with the testimony at trial." *Jenkins II*, 2021 WL 979270, at *15. In doing so, the TCCA necessarily decided that Petitioner did not show the prosecution and Mr. Russell "took some action, beyond merely listening, that was designed to deliberately [] elicit incriminating remarks." *Id*. (citation omitted). According to Mr. Russell's trial testimony, Petitioner voluntarily told him details about the murder, and Mr. Russell did not know anything about the victim's death until Petitioner told him about it. *Jenkins I*, 2017 WL 1425610, at *12–13. Based on this proof, the TCCA's adjudication of Petitioner's *Massiah* claim was "not so lacking in justification" to warrant habeas relief. *Donald*, 575 U.S. at 316; *see also Dodson v. Phillips*, No. 1:16-cv-60, 2021 WL 3912794, at *18 (M.D. Tenn. Aug. 31, 2021) (rejecting petitioner's Sixth Amendment challenge where "the record does not reflect" that a jailhouse informant "was an agent of law enforcement when" the petitioner incriminated himself in the absence of counsel).

The same is true of the TCCA's resolution of Petitioner's *Giglio* claim. Trial counsel cross-examined Mr. Russell regarding whether he received any promises from the prosecution to secure his testimony, and he denied the existence of any promise while also describing his criminal background, including his past and present history. *See Jenkins I*, 2017 WL 1425610, at *13. The TCCA noted this proof and, absent a showing of a deal, reasonably applied *Giglio* when it affirmed the denial of relief. *Jenkins II*, 2021 WL 979270, at *15; *see also Jimenez*, 2018 WL 3018218, at *2 (denying discovery of the prosecution's file based on a speculative *Giglio* allegation) (citing *Murphy*, 205 F.3d at 814). Thus, Petitioner has not shown that the TCCA's application of *Massiah* and *Giglio* "was so lacking in justification" to warrant federal habeas relief. *Donald*, 575 U.S. at 316.

Neither has Petitioner demonstrated that the TCCA's decision was based on an unreasonable determination of facts, because he merely makes unaccredited statements that Mr. Russell arranged with the prosecution to obtain incriminating statements from Petitioner for a beneficial outcome of his own case [Doc. 12 p. 233–363]. But these speculative assertions are insufficient to "compel the conclusion" that the State courts' factual determinations on this issue "were more than just debatable but in fact altogether unreasonable." *Carter v. Bogan*, 900 F.3d 754, 768 (6th Cir. 2018) (emphasis and internal quotations omitted); *Grant v. Trammell*, 727 F.3d 1006, 1025 (10th Cir. 2013) (citation and internal quotation marks omitted).

Accordingly, the decision rejecting this claim is not contrary to, nor does it involve an unreasonable application of, clearly established federal law, and it was not based on an unreasonable determination of facts in light of the evidence presented.

## IV.    CERTIFICATE OF APPEALABILITY

A petitioner must obtain a certificate of appealability ("COA") before he may appeal this Court's decision denying federal habeas relief. 28 U.S.C. § 2253(c)(1). A COA will not issue unless a petitioner makes "a substantial showing of the denial of a constitutional right" of any claim rejected on its merits, which a petitioner may do by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). To obtain a COA on a claim that has been rejected on procedural grounds, a petitioner must demonstrate "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack*, 529 U.S. at 484. Applying this standard, the Court concludes that a COA should be denied in this case.

48

**V.      CONCLUSION**

Petitioner has failed to demonstrate an entitlement to federal habeas relief.  Therefore, his petition for a writ of habeas corpus will be **DENIED**, and this action will be **DISMISSED WITH PREJUDICE**.  A certificate of appealability from this decision will be **DENIED**.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

**SO ORDERED:**


s/Clifton L. Corker
United States District Judge

49